SALLY (UNITED STATES v.). See Case No. 16,215.

# Case No. 12,259.

## The SALLY MAGEE.

[Blatchf. Pr. Cas. 379.] [1]

District Court, S. D. New York. July 30, 1863.

In admiralty.

# Case No. 12,260.

## The SALLY MAGEE.

[1 Blatchf. Pr. Cas. 382; [1] Betts, Pr. Cas.]

District Court, S. D. New York. July 30, 1863.[2]

PRIZE—AVERMENTS—PROPERTY OF CONSIGNEES—BELLIGERENT CAPTORS—NEUTRAL CREDITORS—POWERS OF UNITED STATES—TEST OATH.

1. Suppression, in the test oath to the claim, of the fact that the claimants were resident

---

1 [Reported by Samuel Blatchford, Esq.]
2 [Affirmed in 3 Wall. (70 U. S.) 451.]

traders in the enemy's country, it averring that they were citizens of the United States.

2. The case of The Hiawatha, 2 Black [67 U. S.] 635, determines that the United States givernment is, in this war, clothed with all the rights conferred by international law upon separate nationalities in a state of public hostilities with each other; and that a vessel and the cargo on board of her, being the property of residents in an insurrectionary state of the United States, are enemy's property, and subject, in the federal court, to condemnation, on capture at sea, as lawful prize.

3. A libel in a prize case need contain no further averment than that the property seized is prize of war.

4. In contemplation of war, the cargo in this case became the property of the consignees from the time of its being laden on board of the vessel and from tne execution of the bills of lading therefor.

5. It is a settled principle of the prize procedure that belligerent captors are discharged of liens or equities of neutral creditors resting upon the effects of an enemy seized at sea. The acts of congress of July 13, 1861, August 6, 1861, and March 3, 1863 (12 Stat. 255, 319, 762), relate to confiscations for intraterritorial offences, and not to capture at sea.

In admiralty.

BETTS, District Judge. The above vessel and cargo were captured, as prize, at sea, off Cape Henry, June 26, 1861, by the United States ship-of-war Quaker City, and were sent to this port for adjudication. A libel was filed against the prize July 9 thereafter, in which were set forth, under special allegations, various causes of seizure, amounting to confiscable offences, according to public law. Three several claims were interposed thereto by the same proctor, July 23, 1861, in which, on the accompanying test oaths, it is attempted to raise particular issues of pleading in the suit.

1. Alexander Soule intervened, as master of the vessel, on behalf of David Currie, William Currie, George Allen, Isaac Davenport, Jr., Robert Edmond, and James H. Blair, as owners of the vessel, her tackle, and furniture, averring that they were citizens of "the United States of America," and not disclosing the fact that they were resident traders in Richmond, Virginia, an insurrectionary state, then in open rebellion and war against the United States, although the master attached his test oath to the claim, asserting his knowledge of the ownership and citizenship of the claimants.

2. Charles M. Fry, Overton M. Price, and Chapman J. Leigh intervened on behalf of themselves and Dunlop, Moncure & Co., and claimed 473 bags of coffee marked "X," and 1,450 bags marked "D M," of the said cargo, on the allegation, in substance, that the consignment made on the voyage to Dunlop, Moncure & Co., the last-mentioned firm, was, on arrival of the said vessel as prize, liable to the claimants in the sum of $35,326 and upwards, for acceptances and advances of money agreed to be made, and actually made, in good faith, and that the claimants were directed and authorized to receive the said coffee, and take charge of and sell the same, and apply the proceeds thereof, so far as needed, towards the payment of their own demands, and to hold the surplus for account of Dunlop, Moncure & Co. The test oath to this claim was made by Overton M. Price, one of the claimants.

3. The same claimants intervened and filed a further claim in the name of C. M. Fry & Co., to 1,529 bags of coffee marked "E D," and 10 half barrels of tapioca, part of the cargo of the vessel, and alleged their right and title to the coffee and tapioca to have thus accrued: that the firm of Charles Coleman & Co., of Rio Janeiro, were directed, as factors and commission merchants, there residing, to purchase and ship the merchandise above specified, for the account and to the consignment of Edmond, Davenport & Co., but that, by its invoice, it appearing that the purchase was not made at, or within the limits as to price, the said Davenport & Co., refused it as purchasers, or otherwise than on account of the shippers, Charles Coleman & Co., and Davenport & Co., authorized the claims to receive the same in their place and behalf; and that the firm of Coleman & Co. is composed of subjects of the queen of England, residents in Rio Janeiro, and that of Davenport & Co. of citizens of the United States. The test oath to this claim was made by Overton M. Price, one of the claimants, who swears to the residence and citizenship of the respective parties from his own knowledge, excepting that no other than his own firm reside within this district; and he adds that he believes, from the correspondence of the parties, the other facts to be true. But he omits to state, what he must necessarily have ascertained from the correspondence, that the firm of Davenport & Co. were citizens and residents of Virginia, an insurrectionary state.

It appears from the ship's papers, the proofs taken in preparatorio, and the oath on the ship's registry, that the vessel was built at Baltimore, in 1857, and was registered in the port and district of Richmond, in Virginia, on the 5th of August, 1857, in the name of David Currie, William Currie, George W. Allen, Robert Edmond, Isaac Davenport, Jr., and James H. Blair, all of Richmond, aforesaid, her only owners, and on the oath of one of the said owners. It was admitted, on the hearing, by both parties, that the vessel was despatched from Richmond, on the outward voyage in question, January 2, 1861, laden with the cargo of American produce, shipped by Davenport & Co., of that place, (Dunlop, Moncure & Co., of the same place, being in part interested in the same shipment and in bill of lading therefor,) consigned by Davenport & Co. to Charles Coleman & Co., of Rio Janeiro. The vessel took in her return cargo at Rio, May 10, 1861, bound to Richmond. The cargo was consigned in part by Coleman & Co. to Dunlop, Moncure & Co., and the resi-

due to Davenport & Co., at Richmond, or their assigns, he or they paying freight, and with no other condition or reservation annexed thereto. The transaction, accordingly, appears, upon the face of the ship's papers, to be a trading between two firms, resident in Richmond, Virginia, and another in Rio Janeiro, by the consignment of domestic products by the Richmond houses to Coleman & Co., in Rio, and the transmission back by the latter of the proceeds thereof, in native products of the country of those consignees. The vessel sailed on her outward voyage before the war commenced, and she returned and was captured off our coast without previous knowledge or notice of the state of war, or of the blockade of the port of Richmond, to which she was destined and sailing. The defence of the pleadings was put in with a view to contest on the merits the cardinal questions then pending in litigation in relation to the validity and effect of the war measures of the government and the lawful authority of the judiciary under the existing state of rebellion, which matters have since been determined by the supreme court of the United States in the case of The Hiawatha, 2 Black [67 U. S.] 635. The judgment of the court in that case determines that the United States government is, in this war, clothed with all the rights conferred by international law upon separate nationalities in a state of public hostilities with each other. That case settles the further point presented in this, and adjudges that a ship and the cargo on board of her, being the property of residents in an insurrectionary state of the United States, are enemy's property, and subject, 'in the federal courts, to condemnation, on capture at sea, as lawful prize.

There is no just ground of exception to the sufficiency of the allegations in the libel. It is needlessly special and diffuse, and would have adequately complied with the rules of pleading in prize causes had it contained no further averment than that the seized property is prize of war. The Adeline, 9 Cranch [13 U. S.] 244; The Fortuna, 1 Dod. 81; Hall. Int. Law, c. 31, § 22. No prejudice is, therefore, worked to the claimants, if the libellants fail to prove with exactness all the allegations spread out upon the libel, or if the manner of pleading the offence be faulty in point of form, since the averments set forth the seizure at sea of the vessel and cargo, as prize of war, by a public ship of the United States. 2 Wheat. Append. [15 U. S.] 19. The vessel was, at the time of capture, approaching the port of Richmond, free from all inculpable intentions, inasmuch as she was without warning or knowledge of the existing blockade, and her condemnation is asked by the government solely upon the ground that both ship and cargo are enemy property. The claimants can secure no exemption for the prize by means of the character which they so reservedly and guardedly apply to themselves of "citizens of the Unit-

ed States." The actual owners of the property seized are domiciled traders in Virginia, and the supreme court, in their late decision above referred to, declare that citizens of the United States in rebellion and war against their country are enemies. The public are not yet in possession of the full judgment of the supreme court, exhibiting all the facts and doctrines it establishes in the various particular cases covered by that decision; but it is believed that the forthcoming publication of the official report of the cases comprised in the decision will show that it disposes of the main points involved in this case.

So far as the evidence before the court fixes the interest and posture of these claimants in respect to the cargo, they stand only as creditors of the consignees, Dunlop, Moncure & Co., having no lien on the property, even as against them, and no demand subsisting against the consignment to Davenport & Co., or their assigns personally, or against the consignors of the cargo, Coleman & Co. In contemplation of law, the cargo became the property of the consignees from the time of its being laden on board of the ship, and from the execution of the bills of lading therefor at Rio Janeiro, May 10, 1861. This is a settled doctrine of the American courts of law and admiralty, and, correlatively, of prize courts. Grove v. Brien, 8 How. [49 U. S.] 429; Fitzhugh v. Wiman (in error) 9 N. Y. (5 Seld.) 562; Lawrence v. Minturn, 17 How. [58 U. S.] 100, 107; McKinlay v. Morrish, 21 How. [62 U. S.] 355; The Merrimack, 8 Cranch [12 U. S.] 317. The intervention of the claimants rests upon a supposed right or equity in them to counteract the operation of that rule, and to rescue these consignments from its effect by the interposition of tacit priorities possessed by them. There is scarcely a principle more unquestionably recognized in prize procedures than that belligerent captors are discharged of liens or equities of neutral creditors resting upon the effects of an enemy seized at sea. Upton, Mar. Law (2d Ed.) and cases collected, 153, 158. Neither the ship's papers nor the proofs in preparatorio afford any evidence that the consignees did not acquire full title to this cargo. It is proved that the existence of the war was not known until the capture of the ship and cargo had been consummated; and the transaction suggested in the claim, that Davenport & Co. refused to accept the consignment made to them, and authorized the claimants to receive it, must necessarily have been a transaction subsequent to the actual seizure of the goods as prize, because the necessity and possible availableness of such a procedure could not be known to the parties until the capture was actually perfected. It cannot be implied that a transaction of that character could divest the ownership vested by law in the consignees originally, or impair the validity of the prize captures. Such cap-

ture acquires a force and privilege of no less vigor than the arrest of the property on an execution against the consignees in favor of a judgment creditor. A voluntary shifting of the apparent ownership of the property for the purpose indicated cannot be sustained except upon very satisfactory evidence of bona fides and justness in the operation. The allegations in the claims and test oaths must, therefore, be accepted as a legal construction of their rights adopted by the claimants, and not as the result of any evidence in the case proving a lawful change of interests in the cargo after the commencement of the voyage.

The acts of congress (12 Stat. 255, 319, 762) cited by the claimants relate to confiscations for interterritorial offences, and not to captures at sea of prize of war, and contain no provisions applicable to this suit. The cargo became, therefore, upon the facts, stamped with the character of the consignees and the ship from the inception of the voyage, and could not, by the subsequent interference of other parties in the adventure, be so varied from that condition as to avoid belligerent rights attached to it. The Mary and Susan, 1 Wheat. [14 U. S.] 25.

I am of opinion, accordingly, upon the whole case, that the facts and the law appertaining to it support the prosecution. The Aurora, 4 C. Rob. Adm. 218; The St. Jose Indiano, 1 Wheat. [14 U. S.] 208. A decree of condemnation and forfeiture of the vessel and cargo is, therefore, ordered.

NOTE. The counsel for the claimants, in the written brief submitted by them, state: "If any doubt is entertained by the court as to the truth and good faith of the claimants' claim, further proof will set it at rest." On the 10th of August thereafter the claimants filed their appeal from the judgment to the supreme court without previous application to this court for leave to give further proof in the suit.

An appeal was taken to the supreme court from this decree as to the cargo, but not as to the vessel, and the decree was affirmed March 12, 1866. [3 Wall. (70 U. S.) 451. For hearing on pleadings and proof, see Case No. 12,259. See, also, Case No. 12,261.]